**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CRAFTS PRECISION INDUSTRIES, INC., Respondent.**

No. 93–1604.

United States Court of Appeals, First Circuit.

Heard Jan. 4, 1994.

Decided Feb. 15, 1994.

---

Harold N. Mack with whom Benjamin Smith and Morgan, Brown & Joy, Boston, MA, were on brief, for Respondent.

Jill A. Griffin with whom Howard E. Perlstein, Supervisory Attorney, Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and National Labor Relations Board, Washington, DC, were on brief, for Petitioner.

Before TORRUELLA, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

BAILEY ALDRICH, Senior Circuit Judge.

This is an action by the National Labor Relations Board to enforce an order against Crafts Precision Industries, Inc., a manufacturer, hereinafter Crafts, or Respondent. Originally there were two complaints. Simplifying complaint number 26,573, filed October 27, 1989, it alleges, in substance, that in July 1989, Crafts refused to bargain by partially transferring its polycrystalline department from Massachusetts to its Illinois facility. This transfer, hereinafter the PDT, allegedly was an unfair labor practice designed to discourage lawful employee activities. The complaint sought its return. Acting General Counsel, (Counsel), concedes that, although there was some other language in the complaint, the propriety of this transfer

was the sole issue, in accordance with the charge.

On February 14, 1990 counsel for the Union signed and filed a new charge, numbered 27,070, reading in its entirety,

> The above-named Employer has discriminated against employees because of their participation in protected activities.[1]

Thereafter, on April 23, 1990 the Union filed a further charge, given the same number, stating,

> On or about August 22, 1989, the above-named Employer, by its officers and agents, laid off John Kierstead, Tom McCullough, William Hillson, Kien Nguyen, Son Le, Terrance Crowley, Minh Ha and Thinh Pham because of their union activities.

On April 30, 1990 complaint No. 27,070, was filed, stating,

> 7. On or about August 22, 1989, Respondent laid off the following employees:
>
> | | |
> |---|---|
> | John Kierstead | Terrance Crowley |
> | Tom McCullough | Son Le |
> | William Hillson | Minh Ha |
> | Kien Nguyen | Thinh Pham |
>
> 8. The layoffs of the employees referred to above in paragraph 7 resulted, in whole or in part, from Respondent's partial transfer of its polycrystalline department from its Canton facility to its Illinois facility in July, 1989.
>
> 9. Respondent engaged in the conduct described above in paragraph 7 because the employees named therein and other employees joined, supported, or assisted the Union, and engaged in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and in order to discourage employees from engaging in such activities or other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

■ We must, however, back up. Case No. 26,573 was called for trial on March 19, 1990. At the outset Counsel moved orally to consolidate it with Case No. 27,070. Respondent asserted that "under *Collier*" there should first be arbitration. Counsel's response was that there need be none because the two cases were related.[2] The ALJ allowed the motion, saying he would "hear further argument at the end of this case." He then proceeded to hear the 26,573 case, only.

We find, however, that by letter of February 16, 1990, Crafts learned that three of the eight employees later named in the April enlargement were, allegedly, discharged for individual reasons as well as because of the non-negotiated PDT. When this second "consolidated" case was later tried, Counsel, though satisfying the ALJ of the wrongfulness of this transfer, did not show it cost any of the named employees' jobs. Instead the offered proof was simply that three of the group were wrongfully discharged on account of individual lawful, but displeasing conduct.

On this basis Crafts complains that the charge that prevailed was not made within Section 10(b)'s six months from August 22, 1989, and that this was a jurisdictional defect. Even if the February 14, 1990 charge were construed as insufficient, Crafts must fail. The six months provision is not jurisdictional, but is an ordinary statute of limitations, *see NLRB v. Silver Bakery, Inc.*, 351 F.2d 37, 39 (1st Cir.1965), and, as such, may be waived. *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 351 n. 2 (1st Cir.1990). Immediately prior to the hearing on the 27,070 complaint Crafts knew of the separate claims of the three individuals. It did not seek to amend its pleadings or make any attempt to object on the ground of lateness. The Board first heard of Crafts' Section 10(b) objection by way of an objection taken to its opinion. Even were the point valid, it was too late.

We turn to the case before us. The Board has affirmed the ALJ's finding that five of the eight employees named in the second complaint were discharged not because of the machinery transfer, but, rather, solely for economic reasons and thus not as a result of

---

1. On the issue of notice, as well as satisfying section 10(b)'s six months limitation, the Board's brief describes this as "plain language." It may be plain, but it is hardly explicit.

2. It is now the Board's position that the cases were not related.

the PDT, found to be an unfair labor practice by the ALJ. However, it reversed his finding that the PDT was an unfair labor practice, finding, instead, that it, too, was economically justified. Correspondingly, it found that Crafts' allegedly improper statement that it would make the transfer unless the union agreed to a modification in the contract was not a threat, but a fair announcement. Accordingly, all that is before us is the Board's affirmance of the ALJ's finding against Crafts with respect to laying off three individuals, Kierstead, McCullough and Hillson.

■ The ALJ and the Board found that economic considerations justified discharges,[3] but that unfair reasons predominated in the case of these three. It is common ground that this is a "mixed motive" case, to be governed by the shifting-burden analysis in *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court upheld the *Wright Line* analysis, stating it as follows:

> the General Counsel carrie[s] the burden of persuading the Board that an antiunion animus contributed to the employer's decision to discharge an employee, a burden that does not shift, but … the employer, even if it fail[s] to meet or neutralize the General Counsel's showing, [can] avoid the finding that it violated the statute by demonstrating by a preponderance of the evidence that the worker would have been fired even if he had not been involved with the union.

*Id.* 462 U.S. at 395, 103 S.Ct. at 2471. *See also Herrick & Smith v. N.L.R.B.*, 802 F.2d 565, 570 (1st Cir.1986) (employee's protected conduct must be a "substantial or motivating factor for the discharge").

■ In reviewing the Board's findings, the court will not "displace the Board's choice between two fairly conflicting views,

even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). However, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* .

Respondent argues, on the basis of this last quoted clause, that on the affirmative finding of the economic necessity of layoffs, with no finding that more layoffs were made than necessary, the evidence was insufficient to support the Board's findings, (1) that the three employees were laid off because of their protected activity, and (2) that the company had failed to show that the three would have been laid off regardless of their union activity.

*Hillson*

■ In July 1989, Hillson complained to McCullough, the chief union steward, that he had not received a pay raise resulting from an earlier successful grievance. McCullough pursued the matter with management twice in July and again within a week before the August layoffs. There was nothing else by way of a prima facie case. We may agree that timing can be an important factor in determining whether a discharge is motivated by the employee's protected activity. *N.L.R.B. v. Vemco, Inc.*, 989 F.2d 1468, 1479, *amended*, 997 F.2d 1149 (6th Cir.1993). Here, however, we face an unusual situation; the Board found that layoffs at that time were justified. When a mass layoff is justified, it is not unlikely that some affected employees will have recently engaged in minor protected conduct. That, standing alone, should not establish a prima facie case. Indeed, we suggest that to hold so would be wrong in principle. Employees, aware of the fact that reductions were imminent, could strive to make minor trouble and thus place

---

**3.** Crafts presented evidence that its sales had dropped considerably; that it had laid off three other union employees in July, and had reduced

its non-union management support staff by some 30%.

themselves in an automatically protected group. We consider it speculative to say the Board carried its burden. Rather, that it reacted automatically here seems confirmed by its findings with respect to Kierstead.

*Kierstead*

■ Like Hillson, Kierstead claimed that Respondent was not complying with obligations that arose out of a previously successful grievance. The Board found not only that Kierstead was laid off just days after filing his labor grade grievance, and just two weeks after being reinstated by court order, but also that the company had given Kierstead a false reason for its failure to reinstate him at his previous labor grade—that the PCD operations in Massachusetts had been fully terminated, a claim retracted by the company at the ALJ hearing. If this made out a prima facie case, it is rebutted. Four employees were laid off in Kierstead's department, one of whom, Son Le, was in a higher labor grade than Kierstead. The ALJ and the Board found that the other three layoffs, including Le's, were economically justified. As it is undisputed that seniority was honored in the layoffs, Kierstead cannot argue that another employee should have been chosen in his place; all were either more senior or in considerably higher labor grades.[4] Further, the fact that Respondent reached beyond Kierstead's labor grade and into Le's indicates that Kierstead was not singled out unfairly; in Kierstead's division, as in the Natural Diamond division, Respondent exhausted the lowest labor grade before reaching into a higher grade.[5] No claim was made, by Le or Kierstead, that Le was laid off as a cover for Kierstead's layoff, despite the presence of the union representative throughout the hearing. *See, e.g., N.L.R.B. v. Jack August Enterprises, Inc.,* 583 F.2d 575, 578–79 (1st Cir.1978). Given the Board's unchallenged findings regarding the other layoffs in this department,

Kierstead would have been laid off regardless of his union activity.

*McCullough*

■ With respect to McCullough there was more to the case, though on both sides. From Crafts' standpoint, it did away with his position of inspector, and provided that each worker should inspect his own work. Pappas, Crafts' chief officer, testified that he had contemplated that this would effect a substantial saving. As against this the Board noted that this had been done, if at all, in his head, without paper analysis. To this Pappas replied that it had worked out to save some $20,000. It would be difficult to say that this affair was more than a draw, and insufficient to justify a conclusion either way. The operator of a small company must normally do much in his head. There was, however, more. For over ten years McCullough had been union steward, responsible for pursuit of union members' grievances with management. In December, 1988, he received a labor grade increase, and was told by his supervisor that he would have received the increase at least two years earlier had it not been for his union activities. Pappas became angry with McCullough in June 1989 when he refused to move the location of a vote on a working foreman proposal. After the vote, Pappas asked for the vote total, but McCullough refused to tell him. Twice in July and once during the week before the layoffs in August, McCullough pursued a pay rate dispute with management on behalf of Hillson. On August 15, McCullough discussed with his supervisor Kierstead's pay grade dispute, and his supervisor told McCullough that his name had come up in a management conversation "with some disfavor" and that he should be on his best behavior. McCullough discussed the same issue with Pappas on August 17, and filed a grievance on Kierstead's behalf the next day.

---

**4.** The bargaining agreement provided that in selecting employees for layoff, "seniority shall be the deciding factor among employees physically fit and competent through knowledge, skill, and efficiency to perform the available work." Agreement at § 12(b); T. & E.A. at 347.

**5.** The bargaining agreement also provided that "In the case of layoff, an employee displaced from his occupational grouping may exercise his shop seniority and bump into any job in the same or lower labor grade providing he is then qualified to perform the work ...." Agreement at § 12(a); T. & E.A. at 347.

The Board held that this was sufficient evidence of "animus to McCullough's union activities by the Respondent up to the time immediately preceding his layoff." Although, for reasons already given, we could not accept all of its reasoning, we cannot fault the Board in this instance. Obviously a union steward will not be management's fair-haired boy or he would quickly lose favor with the union. Correspondingly, we would think occasionally heated disputes—depending, perhaps, on personalities—must occasionally occur.[6] It would seem unreasonable that a union steward could have an ace-in-the-hole safe conduct against lay-off by the fact that his pursuing grievances was sometimes irritating. However, there was more than that here. One does not punish a steward for his union representation. We find the Board was warranted in holding it had a prima facie case. Nor can we say that Respondent's showing that it would have done away with the inspector's position in any event was compelling as matter of law. The work required somebody's time.

*The order as to McCullough is enforced; otherwise denied.* No costs.

---

[6]. We note with some surprise that the Board seemingly charged against Pappas the fact that he fought a grievance "vigorously."